FREEMAN et al. v. FREEMAN.

(Circuit Court of Appeals, Eighth Circuit. March 30, 1907.)

No. 2,442.

**1. TRUSTS—ESTABLISHING BY PAROL—KANSAS STATUTE.**

Gen. St. Kansas 1901, § 7875, which provides that no trust concerning lands, except such as arises by implication of law, shall be created, unless in writing, etc., does not prevent a complainant from showing by parol that real estate conveyed to defendant was in part paid for by others, together with other tracts, and that the conveyance was pursuant to an agreement made in good faith between the purchasers that defendant should hold the same in trust for the benefit of the one to whom it should be allotted in a division; the trust in such case being one arising by implication of law under sections 7880 and 7882 of the statute as construed by the Supreme Court of the state.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 47, Trusts, §§ 62–65.

Construction of statute—State laws as rules of decision in federal courts, see note to Wilson v. Perrin, 11 C. C. A. 71.]

**2. SAME—EVIDENCE ESTABLISHING—IMPLIED TRUST.**

In a suit by heirs to recover a lot, the title to which was alleged to be held in trust by defendant for the benefit of their decedent, it was shown that he and his family, consisting of his parents, two brothers, and a sister, the defendant, from time to time during a number of years had purchased lots and other real estate with the intention of holding the same in partnership until a division was made. All contributed to the payment of the purchase money, except perhaps the defendant, and toward paying off incumbrances. The title to all of the property was vested in the father and in defendant, who was unmarried and lived with her parents. The father, having reached an advanced age, conveyed the property standing in his name, including the lot in controversy, to defendant, as the evidence tended to show, on an agreement and understanding that she should hold the same in trust for the benefit of all until a division should be made. This deed was not recorded, but was known to the others. The sons having removed to a distance, defendant looked after the property and received and applied the remittances made by her brothers. After some correspondence respecting a division, she caused a deed to be executed to the decedent by her parents, conveying to him the lot in controversy, subject to a life estate in the grantors, which deed the decedent accepted as satisfactory. A few days afterward, and before his deed was recorded, he was killed, and defendant thereupon recorded her prior deed and claimed the property. *Held*, that such evidence, including the corroborative facts which were undisputed, was sufficient to raise an implied trust which entitled complainants to a conveyance of the lot from defendant, subject only to a life interest in her parents.

Appeal from the Circuit Court of the United States for the District of Kansas.

Rush C. Butler (Eldon J. Cassoday, O. J. Wood, and Alfred A. Scott, on the brief), for appellants.

Joseph G. Waters (A. H. Case, on the brief), for appellee.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

HOOK, Circuit Judge. This was a suit by the widow and children of John E. Freeman, deceased, against Harriet E. Freeman, to establish a trust and to compel a conveyance of a lot in Topeka, Kan. Upon final hearing the trial court dismissed complainants' bill, and they have appealed.

John E. Freeman and the defendant Harriet were brother and sister. The defendant's title, which was sought to be charged with the trust, came to her by warranty deed from her parents. The theory of the trial court in dismissing the bill was that complainants were seeking to establish an express trust in real property by parol evidence contrary to the provision of the Kansas statute (Gen. St. 1901, § 7875) that:

"No trust concerning lands except such as may arise by implication of law shall be created, unless in writing, signed by the party creating the same, or by his attorney thereto lawfully authorized in writing."

The case of Gee v. Thrailkill, 45 Kan. 173, 25 Pac. 588, was cited and applied. In that case Thrailkill conveyed real property to Mrs. Gee by absolute and unconditional warranty deed, and afterwards sought to show by parol evidence that the agreement at the time was that Mrs. Gee might sell or mortgage it to raise funds for him, and that whenever he so desired she should reconvey to him any part remaining in her hands. It was held that Thrailkill was endeavoring to establish an express trust by parol, and that the case was therefore within the statute.

This appeal presents three lines of inquiry: What trusts in respect of realty in Kansas are not controlled by the above section of the statute? What was the case stated in the bill of complaint? What was established by the proofs? Of these in their order:

Other sections of the Kansas statute (sections 7880, 7882) provide that when a conveyance for a valuable consideration is made to one person, and the consideration therefor paid by another, no use or trust shall result in favor of the latter, but that this provision shall not apply where it shall be made to appear that by agreement and without any fraudulent intent the party to whom the conveyance was made, or in whom the title shall vest, was to hold the land or some interest therein in trust for the party paying the purchase money, or some part thereof. It will also be observed that the section of the statute applied by the trial court expressly excepts from its operation such trusts as arise by implication of law.

Rayl v. Rayl, 58 Kan. 585, 50 Pac. 501. In this case a farm consisting of a half section of land was purchased, and the deed taken in the name of Elijah Rayl, under an agreement that he should hold the title for his mother, himself, and a minor brother; that he and the brother were to manage the farm as partners; that the mother and the other minor children were to aid in operating and in paying for the farm and at the end of five years a designated quarter section should be conveyed to her. The mother and a daughter attended to the housework, and all the family and the farm hands boarded with her. Other members of the family helped in raising crops. The mother earned some money in weaving carpets and in keeping boarders. The results of her labors and of those whose services she was entitled to went to the payment of the land, and her contributions exceeded in value the purchase price of the part she was to have. When the time came for Elijah to convey he refused, and in defending her suit contended that she was endeavoring to enforce an express trust resting in parol. The Supreme Court

of Kansas held, however, that a trust arose by implication of law which could be established by parol evidence and enforced under the exceptions in the Kansas statutes.

Franklin v. Colley, 10 Kan. 260. In this case two women jointly purchased two lots; each furnishing an equal part of the consideration. But by agreement, and without any fraudulent intent, they had the deed made to one; she to hold the title until the other became of age. They jointly improved the property, and afterwards the one who held the title repudiated the right of the other. In a suit to establish the trust and to compel a conveyance, the court held that there was a resulting trust which might be shown by parol evidence, and that the statutes were not intended "as limitation, restriction, or prohibition upon the creation of what are known as resulting trusts, implied trusts or constructive trusts." It is also well settled in Kansas that when the legal title to real property has been acquired, and is being held wrongfully and in fraud of the rights of the equitable owner, a constructive or involuntary trust arises and may be established by parol evidence. Typical cases of trusts of this character are Howard v. Howard, 52 Kan. 469, 34 Pac. 1114, and Rose v. Hayden, 35 Kan. 106, 10 Pac. 554, 57 Am. Rep. 145.

Was the bill of complaint framed upon the theory of an express trust, or did it charge a trust arising by implication of law? If the former was intended, it must be said that the existence of the essential writings would have to be inferred, as the pleader made no mention of them in the bill of complaint. On the other hand, the voluminous averments of the circumstances surrounding the acquisition of the legal title by the defendant, the relations between the parties, and the contributions of moneys by complainants' intestate, show that the intention was to exhibit such a state of facts as would give rise to a resulting or constructive trust, as distinguished from one created by written agreement. While the averments of the bill are somewhat lacking in precision and definiteness in this particular, we are of the opinion that they are sufficient. The following appears to be quite clearly charged: Before the conveyance of the lot in controversy to the defendant, her father held the legal title to it, and also the legal title to other lands and property. During his lifetime he and his three children, John E. Freeman, the defendant Harriet, and a son Elijah, had purchased several tracts of land, and the title was taken in the name of the father for the benefit of all of them. Each of them contributed to the purchase price. John E. Freeman, the complainants' intestate, sent from time to time to the father and to defendant Harriet, who was managing 'the father's business affairs, large sums of money to be applied in the payment of certain notes, some of which were secured by mortgage upon the property held in the name of the father for the benefit of all of them, and those sums of money were so applied. Prior to the death of the father a division of the property so acquired and held was agreed upon by the parties in interest. Each one was to receive certain specific parcels. Under this agreement for division John E. Freeman was to have the lot in controversy, and the defendant was to have other property, exclusive of the lot, in full of her share in the common holdings. On April 7, 1897, the father conveyed to defendant Harriet

by warranty deed various pieces of property including the lot in controversy. The mother joined in the deed. This deed was made in furtherance of the relations between the parties with respect to the property, and with the understanding and agreement that Harriet was to hold the legal title in trust, and when the time for division came she was to convey accordingly. While the deed recited a consideration of $500, the defendant paid nothing at the time; the real consideration being as already mentioned. When the deed was made the father was of advanced age and in feeble health, and defendant Harriet was his confidential agent and adviser and attended to his business affairs. She assented to the trust condition upon which the legal title was placed in her, and agreed to make the conveyances to the others of their respective parcels, including a conveyance to John E. Freeman of the lot in controversy. She was also the trusted agent of her brother, John E. Freeman, but after his death, which occurred November 7, 1901, she repudiated the trust relation, and sought to defraud the complainants, who are his heirs, out of the property. There were also averments of a bona fide attempt by the defendant, during the lifetime of John E. Freeman, to execute the trust in respect of the lot in controversy, but which failed for reasons that will be mentioned in a discussion of the evidence. In our opinion these averments are of a trust arising by implication of law within the rule of Rayl v. Rayl, 58 Kan. 585, 50 Pac. 501, which may be established by parol evidence. It was charged by fair inference that the consideration for the conveyance of the legal title to the defendant was not paid by her at the time the deed was executed, but consisted of the previous payments and contributions of money made by the three children, and particularly by John E. Freeman, and that by agreement, and without any fraudulent intent existing at the time, the lot in controversy conveyed to the defendant was to be held by her in trust for John E. Freeman.

In approaching a consideration of the evidence, it is proper to say that, while this suit directly involves but one piece of property, the actual dealings of the parties took a much wider range, embraced quite a number of parcels of land, and covered a period of more than 10 years. The particular transaction in question did not begin and end on the day the legal title was conveyed to the defendant. It was but a part of a comprehensive course of dealing, and, as it was inseparably related to and dependent upon other transactions of like character, a true conception of it requires a consideration of all its accompaniments. It should also be observed that it was not necessary to the creation of an implied trust that John E. Freeman should have paid all of the consideration for the deed from the father to the defendant, or that what he did pay should be separable from the remainder of the consideration and some specific and divisible part thereof have been intended to apply to the particular lot in question, as distinguished from the remaining property, all of which in the aggregate was the subject of their transactions, or that the consideration paid by him should have been paid at the precise time the deed was executed. If the evidence shows that John E. Freeman paid, in whole or in part, the consideration for the deed from the father to the defendant, and that by agreement and without any fraudulent intent the latter took the legal title

so conveyed in trust for those whose payments constituted the consideration, and it was afterwards determined that upon the apportioning of their interests John E. Freeman was to have the lot in controversy, we then have a trust arising by implication of law which need not be in writing signed by the party creating it, but of which the proof may rest in parol.

In 1888 the Freeman family consisted of the parents, three sons, and a daughter. The sons were Elijah, Henry, and the complainants' intestate, John E., and the daughter, the defendant Harriet. They were industrious and saving and accumulated considerable real property, consisting of improved and unimproved lots in Topeka and a farm of about 600 acres of land in Wabaunsee county, Kan. In July, 1888, John E. Freeman married the complainant Ida. A few days before his marriage he conveyed to his mother the real property which he owned in Topeka, consisting of a number of improved lots and an interest in others. This conveyance was voluntary and without any consideration moving from the grantee. The deed was recorded the day before his marriage. The title to the farm in Wabaunsee county stood in the name of his son Henry, until before his marriage he conveyed it to one of his parents. Elijah also owned some property which took a similar course, and there was some in the name of the defendant. In addition there was some property, including the lot in controversy, the title to which was in the name of the father. The result of these conveyances was that the title to all of the real estate in Topeka and the farm in Wabaunsee county belonging to the members of this family became vested in the parents and the daughter. The only credible explanation of the conveyances by the sons is that found in the testimony of the complainant Ida, who said that the purpose was that all the real estate of the family should be held in partnership; that thereafter the property was so regarded and dealt with; and that the members of the family called themselves the Freeman firm. Some of this property was incumbered, and from time to time the incumbrances were reduced and finally paid. Some of the lots conveyed by John E. Freeman to his mother were sold, and the proceeds in part applied to the discharge of mortgages. The property was handled and dealt with, taxes thereon paid, repairs and improvements made, and rents collected, as a common property, without regard to any individual ownership. About 18 months after his marriage, the son John removed to Chicago. He was accidentally killed November 7, 1901. Shortly before this Elijah removed to California. Henry, at some time not indicated by the record, removed to the farm in Wabaunsee county, where he died in 1896, leaving a widow. Harriet, who never married, remained in Topeka with her parents, looked after the common property, and received and applied the contributions from the other members of the family. The father died in the fall of 1902 at the age of 94 years. The mother was 80 years of age when she gave her testimony in 1905.

John E. Freeman had been in the service of the Santa Fé and St. Louis and San Francisco railroad companies for about 25 years. He was a cook in the private cars of the presidents of those companies, and his salary ranged from $60 to $95 per month with additions by

way of tips and presents. For many years, commencing before his marriage, and ending shortly before his death, a substantial part of his earnings was paid to his father and sister to be applied to their household expenses and to incumbrances, improvements, and taxes upon the real property. For the most part the remittances, aggregating several thousand dollars, were made direct to the defendant, and these remittances were continued although the family of John E. Freeman was growing in size and the cost of their support and maintenance was increasing, and although defendant and her parents who were living in the homestead were possessed of property worth nearly $20,000, if her testimony is to be believed. During her husband's absence from home, the complainant Ida drew his monthly wages and attended to the remittances to the defendant at Topeka. The son Elijah also contributed to the common account a part of his earnings, though the proof is not definite as to the amounts or dates, and while living in Topeka he devoted his labor to the repair and improvement of the property. A letter written by Henry Freeman in November, 1891, appearing in the record, indicates that he also was laboring in the common interest. A statement of his farm operations for the year showed the amount of his receipts, and that after paying the taxes and insurance and the cost of some improvements he had applied $1,200 upon an indebtedness in which they were interested and had but $81 left for household expenses. It is doubtful that Harriet personally contributed much of consequence besides her attention to her parents, to the property, and to the money contributed by the others. She testified that she kept lodgers and earned money in that way, and that she had accounts of her personal affairs and an account in bank, but she produced no evidence but her own words, which were indefinite, vague, and unsatisfactory. Notwithstanding all this, at the time of the trial, through deeds from her parents, the title to all of the property of the family stood in her name, excepting some parcels which she had previously conveyed to John E. Freeman as part of his share. The property in her name and which she claimed to own absolutely was at her own valuation worth over $17,000 after deducting incumbrances. She said that the farm had been conveyed to her by her parents by way of gift. The lot in controversy and other lots were conveyed to her for a recited consideration of $500. This is the deed which complainants attack as an absolute transfer and claim was a conveyance in trust. Defendant says she paid the $500, but our conviction is otherwise. The various letters written and the acts of the parties during the years preceding the controversy, and the testimony that is in harmony with those letters and acts, and therefore the more credible, have convinced us that the consideration for this deed and the other deeds to the defendant consisted in the contributions of all of the children, and that there was an unqualified agreement that she was to hold the title in trust pending a division among them. There was that verity in the correspondence and acts of the parties which renders futile the denials born of the temptation which arose upon the death of John E. Freeman. So much for the consideration which moved the father to make the deed to the defendant and the substantial participation of John E. Freeman in the payment of that consideration.

Most of the letters introduced in evidence were addressed to John E. Freeman, and were produced by the complainants. The defendant said that those she received from him had been destroyed; but her written words, when read in the light of admitted and proven facts, clearly show that during his lifetime she recognized the conditions upon which she acquired title, that he was entitled to a share of property, and that the lot in controversy had been set off to him in the division. Before referring to the letters bearing upon this feature of the case, it should be said that the deed to defendant of April 7, 1897, conveying the lot in controversy and other property, was not recorded until after the death of John E. Freeman, though he knew of its existence. On March 28, 1900, the defendant prepared a deed from the parents to John E. Freeman conveying the lot in controversy, subject to a life estate in the grantors, and when it was executed and acknowledged she signed as a witness to their signatures. This deed was not delivered to John E. Freeman until shortly before his death. The letters written by the defendant indicate that early in 1901 John E. Freeman was pressing for a division of the property. On February 25, 1901, she wrote him that the lot in controversy was his, and that she had on hand $1,100, including Elijah's checks and farm rent after payment of taxes. On March 11, 1901, she wrote him that she would answer him in full in a few days, and that she thought there was some way of adjusting their matter satisfactorily. On March 18, 1901, she wrote as follows:

"Mother says when we meet that the farm can be adjusted agreeable to all she thinks and the reason she said for the north lot to be Liges. You all are to have the lots at their death, but she thought if you took them now and improved them you of course would expect the income from your investment which is right. * * * We ask both of you all to give advice or some idea as to the division. Your last letter is the first we ever got. But I feel that things will be alright."

The evidence warrants the conclusion that the lots the defendant referred to in this letter were two adjoining lots on Kansas avenue, in Topeka, the south one being the one in controversy, and that it was the intention that Elijah Freeman have the north one. On October 13, 1901, she sent him the deed of March 28, 1900, purporting to convey the lot in controversy, also two deeds from herself, one for a part of the farm in Wabaunsee county, and the other for a small tract of land in Topeka. None of the deeds had been recorded. In the letters accompanying them she said that she would have attended to the matter sooner, but wished to be careful to make no mistakes; that she had done her utmost to adjust matters, and hoped she had. Evidently, John E. Freeman acknowledged receipt of the deeds and expressed his satisfaction, for on November 5, 1901, she wrote him that she received his letter and was glad that things met with his approval; that she should have attended to matters before, but as that was their final decision she supposed all was well, and she put it off for a convenient season. Two days afterwards John E. Freeman was killed; the defendant attended his funeral in Chicago on November 11th; and on the 14th, after her return to Kansas, she placed her deed of April 7, 1897, of record, and asserted that she owned the lot in controversy.

The three deeds to John E. Freeman were recorded December 4, 1901. The claim of defendant that the deed of March 28, 1900, was merely to secure John E. Freeman for moneys which he agreed to advance for the improvement of the property, and that as he advanced none he took no title, is not worthy of serious consideration. It is inconsistent with evidence that satisfies our judgment and with the whole atmosphere of the case.

In the fall, winter, and spring of 1901–02, a building was constructed upon the two lots on Kansas avenue; the south one being the lot in controversy. The work was commenced in September, 1901, before the defendant sent the deed of March 28, 1900, to John E. Freeman. To raise part of the cost she mortgaged both lots for the sum of $1,500. The mortgage was unsatisfied at the time of the hearing. The improvement of these lots by the construction of a substantial building was the subject of frequent discussion with John Freeman prior to his death. Details of construction, estimates of cost, and propositions for rental were submitted to him. The defendant has not shown that any part of the cost of this improvement above the proceeds of the mortgage referred to was paid from her personal resources.

Our conclusions are that when the title to the property of this family, including the lot in controversy, was vested in the defendant, a part of the consideration for the conveyances was paid by John E. Freeman; that when defendant acquired the legal title it was taken in good faith, without any fraudulent intent, and for the benefit of those who paid the consideration, and it was so taken upon the understanding and agreement that there should be an equitable division thereof; that in the division subsequently agreed upon the lot in controversy fell to John E. Freeman; that the defendant expressly recognized his right prior to his death; and that the deed of March 28, 1900, from his parents to him, which was prepared and witnessed by the defendant and sent by her to him in October, 1900, was intended to be in fulfillment of her trust obligation, but was ineffectual for that purpose because of her prior deed from the same grantors.

The decree of the Circuit Court is therefore reversed, with direction to enter a decree requiring the defendant to convey the lot in controversy to the complainants by sufficient deed, subject, however, to one-half of the incumbrance mentioned as being upon it and the adjoining lot, and also subject to the life estate of Letitia Freeman, the mother. The decree should contain the usual provisions in case of her refusal. If the mother is still living, there should be no decree for rents and profits, because after the payment therefrom of taxes, repairs, and the proper proportion of the interest upon the incumbrance the remainder belongs to her. In case she is not living, the decree should provide for an accounting of rents and profits for the period subsequent to her death.